**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
245 Fischer Avenue, Suite D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

[Additional Plaintiff's Counsel on Signature Page]

*Attorneys for Plaintiffs,*
Crystal Howard and Mariana Torres

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**CRYSTAL HOWARD and MARIANA TORRES, Individually and On Behalf of All Others Similarly Situated,**

**Plaintiffs,**

**v.**

**FAROUK SYSTEMS, INC.,**

**Defendant.**

**Case No.:**

**<u>CLASS ACTION</u>**

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF:**

1) **CALIFORNIA CONSUMER LEGAL REMEDIES ACT ("CLRA"), CAL. CIV. CODE §§ 1750, *ET SEQ.*;**
2) **CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;**
3) **VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL"), CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*;**
4) **BREACH OF EXPRESS WARRANTY**
5) **UNJUST ENRICHMENT; AND,**
6) **INTENTIONAL MISREPRESENTATION.**

**JURY TRIAL DEMANDED**

KAZEROUNI LAW GROUP, APC

## INTRODUCTION

1. Plaintiffs Crystal Howard ("Plaintiff Howard") and Mariana Torres ("Plaintiff Torres") (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this First Amended Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of defendant Farouk Systems, Inc. d/b/a CHI and BioSilk ("Farouk" or "Defendant") concerning unlawful labeling of Defendant's haircare products, with: a) the designation and representation that the products are more "natural" than they actually are; and b) the designation and representation that the products are/were made in the USA without clear and adequate qualification of the foreign ingredients and components containted therein, as required by federal rules and California laws.

2. These misrepresented products are sold through various channels, including, but not limited to, direct-to-consumer sales on the Defendant's website, third-party platforms such as Amazon.com ("Amazon"), professional hair care salons, and third-party merchants operating brick-and-mortar stores like Marshalls.

3. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by their attorneys.

4. As stated by the California Supreme Court in *Kwikset v. Superior Court*, 51 Cal. 4th 310, 328-29 (2011):

> **Simply stated: labels matter.** The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities that may come to associate with a particular source. . .In particular . . . **the "Made in U.S.A." label matters**. A range of motivations may fuel this preference, from desire to support domestic jobs or labor conditions, to simply patriotism. The Legislature has recognized the

> materiality of this representation by specifically outlawing deceptive and fraudulent "Made in America" representations. (Cal. Bus & Prof. Code section 17533.7; see also Cal. Civ. Code § 1770, subd. (a)(4) (prohibiting deceptive representations. Of geographic origin)). The objective of section 17533.7 "is to protect consumers from being misled when they purchase products in the belief that they are advancing the interest of the United States and the industries and workers. . ." (emphasis added).

5. Farouk's products are labeled with the express, unqualified representation that they are "Made in the USA," (or another synonomous phrase) either on the Principal Display Panel ("PDP") or another prominent and conspicuous location on the product label. This claim appears on all or nearly all products manufactured, sold, or distributed by the Defendant, including the products purchased by the Plaintiffs.

6. Contrary to Defendant's express representations and its failure to clearly and adequately qualify those representations, the products purchased by Plaintiffs are substantially and materially composed of indispensable foreign ingredients and components.

7. Plaintiffs purchased some of Farouk's best known products including: CHI Infra Silk Infusion, CHI Reconstructing Shampoo, CHI Infra Protective Thermal, and CHI Infra Moisture Therapy Shampoo, all of which are labeled, marketed and sold to consumers as "Made in the USA", as further discussed herein.

8. In addition to the unqualified "Made in the USA" representations on the PDP of all of Farouk's products, Defendant claims certain products are more "natural" than they actually are.

9. The products purchased by Plaintiff Howard are made with numerous synthetic ingredients despite being represented as 90% (or more) natural and all are made with numerous ingredients and components, that are not grown, sourced or otherwise made in the United States, despite being labeled as "Made in the USA" without qualification.

10. Defendant's conduct of advertising and selling deceptively labeled products bearing the representation that such products are 90% or more natural violates: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (2) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq*.; (3) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17500, *et seq*.; and constitutes (4) breach of express warranty; (5) unjust enrichment; and (6) intentional misrepresentation.

11. Defendant's conduct of advertising and selling deceptively labeled products bearing the representation that such products are "Made in the USA" without qualification violates: (1) the CLRA; (2) the UCL; (3) the FAL; (4) 16 C.F.R. § 323 (Federal Trade Commission 2021) (the "MUSA Rule") and constitutes (5) breach of express warranty; (6) unjust enrichment; ; and (7) intentional misrepresentation.

12. This conduct caused Plaintiffs, and other similarly situated consumers, damages, and requires restitution and injunctive relief to remedy and prevent future harm.

13. In addition to the unqualified "Made in the USA" representation on the products purchased by Plaintiffs, Farouk's other haircare products—including, but not limited to, those listed in **Exhibit A** and featured on Farouk's website[1] (the "MUSA Products")—also display the same unqualified "Made in the USA" representation or a similar unqualified U.S. origin claim.

14. Furthermore, in addition to the "natural" misrepresentations on the products purchased by Plaintiff Howard, numerous of Farouk's other haircare products—including, but not limited to, those listed in **Exhibit A** and featured on Farouk's website (the "Natural Products" and together with the MUSA Products, the "Class Products")—also display the same false percentage "natural" misrepresentations.

## JURISDICTION AND VENUE

[1] *See* https://chi.com/shop/categories/hair-care/ (all websites in this First Amended Complaint were last accessed on December 8, 2025)

KAZEROUNI LAW GROUP, APC

15. This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because: (1) there is minimal diversity, including because Plaintiffs are citizens of the State of California and Defendant is a Texas corporation with its headquarters and principal place of business in Texas; (2) the amount in controversy in this matter exceeds $5 million , exclusive of interest and costs; and (3) there are more than one hundred (100) people in the putative class.

16. Venue is proper in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Defendant resides in within this judicial district; (ii) a substantial part of the conduct complained of herein occurred within this judicial district; and (iii) Defendant conducted business within this judicial district at all times relevant. Additionally, this action—previously filed in the Central District of California—had been transferred by Court order into this district. *See* Dkt. 23.

## PARTIES

17. Plaintiff Howard is, and at all times mentioned herein was, a natural person, an individual citizen and resident of the City of Elk Grove, County of Sacramento, State of California.

18. Plaintiff Torres is, and at all times mentioned herein was, a natural person, an individual citizen and resident of the City of Montclair, County of San Bernardino, State of California.

19. Upon information and belief, Defendant is a corporation that is organized and exists under the laws of the State of Texas, with its principal place of business within the State of Texas located at 250 Pennbright Drive, Houston, Texas 77090.

20. Defendant is a manufacturer, distributor and seller of hair care products, predominantely, if not exclusively, made for and marketed to female consumers,[2]

[2] Notably, the only male image that appears in Defendant's marketing materials and on its public-facing website is that of its founder, Farouk Shami. In addition, a search conducted using Defendant's own website search function for the terms "men" and "men's" returned no results indicating that Defendant markets, sells, or distributes products specifically for male consumers.

that conducts business: a) through its website; b) through the websites of third-party vendors, such as Amazon; and c) distributes its products to be sold in brick and mortar stores, such as Marshalls, as well hair care establishments.

21. At all relevant times. Defendant conducted business within the State of California, in the County of San Bernardino, and within this judicial district.

22. Unless otherwise indicated, the use of Defendant's names in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendant, respectively.

## NATURE OF THE CASE

23. Having been in business since 1986,[3] Defendant is among the leading female-focused hair care companies in the United States. Defendant exclusively produces hair care products and does not manufacture or sell general personal care items such as body wash, deodorant, oral care products, or skincare products. Instead, Defendant's entire product portfolio is directed toward hair-specific needs, which are overwhelmingly, if not exclusively, marketed to and used by women.

24. Defendant markets and sells a wide portfolio of hair care products for both women through multiple distribution channels under two sub-brands: CHI and BioSilk.

25. Given its long history in the consumer products industry, along with its vast resources and operational sophistication, it is difficult to understand how Defendant could so blatantly violate the well-established laws, rules, and regulations governing the use of "Made in the USA" or any derivative thereof, or mislead consumers regarding the amount of "natural" ingredients in its products.

26. At all relevant times, Defendant made and continues to make material misrepresentations regarding the Class Products.

---

*See* https://chi.com.

[3] *See* https://farouk.com/about-us/company-overview/ (last accessed on February 20, 2025)

27. Specifically, Defendant advertised, marketed, promoted, and sold the MUSA Products as "Made in the USA" without disclosing the use of foreign ingredients, when in fact this claim was false, unfair and deceptive.

28. Although Defendant represented that the MUSA Products were "Made in the USA" without qualification, the products are substantially made with ingredients and components sourced, grown, or manufactured outside the United States.

29. Each consumer, including Plaintiffs, was exposed to the same material misrepresentations, as materially similar labels were placed on all MUSA Products sold, and currently sold, throughout the United States, including in California.

30. Federal rules and regulations regarding the use of "Made in the United States" claims—including any synonymous claims, whether express or implied—are well-established and clearly defined with respect to products and services.

31. The MUSA Rule clearly defines the meaning of "Made in the United States"[4] and outlines when this designation may be used without qualification. Specifically, clear and adequate qualifications must notify consumers if the good or service contains or is made with ingredients or components that are not made or sourced in the United States.[5]

32. As a consequence of Defendant's unfair and deceptive practices, Plaintiffs and other similarly situated consumers purchased the MUSA Products under the false impression and in reliance upon Defendant's representations that the MUSA

---

[4] *See* 16 C.F.R. § 323.1(a) ("The term Made in the United States means **any *__unqualified__* representation,** express or implied, **that a product or service**, or a specified component thereof, **is of U.S. origin**, including, but not limited to, a representation that such product or service is "made," "manufactured," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.") (emphasis added).

[5] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, **it is an unfair or deceptive act or practice** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), **to label any product as Made in the United States unless** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, ***__and__*** **all or virtually all ingredients or components of the product are made and sourced in the United States**. (emphasis added).

Products were actually made in the United States with ingredients and components sourced from within the United States.

33. As a result, Plaintiffs and other similarly situated consumers overpaid for the MUSA Products, purchased the MUSA Products over the products of competitors, and/or purchased the MUSA Products under the belief that the products were made in the United States and did not contain numerous ingredients and components from outside the United States.

34. Despite the clearly established and well-defined federal rules regarding "Made in the United States" claims, Defendant falsely, unfairly and deceptively advertised, marketed and sold its products, including the products purchased by Plaintiffs, as "Made in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further discussed herein.

35. Had Plaintiffs and other consumers similarly situated been made aware that the MUSA Products contained a substantial amount of ingredients sourced from outside of the United States, they would not have purchased them.

36. As a result of Defendant's false, unfair, and deceptive statements and/or their failure to disclose the true nature of the MUSA Products, along with the other conduct described herein, Plaintiffs and similarly situated consumers suffered harm through the purchase of hundreds of thousands of units of the MUSA Products across the United States, including in California.

37. In addition to the unfair and deceptive representations regarding the MUSA Products, Defendant labeled, marketed, and advertised certain products—such as those purchased by Plaintiff Howard—as containing a specific percentage of "natural" ingredients, often claiming to be highly natural (85% or more), when in fact, this was not the case.

38. Despite its express representation that the Natural Products are made with a high percentage of natural ingredients, these representations are false.

39. Defendant characterized many synthetic ingredients used in the Natural Products as "natural" in order to falsely and deceptively represent high natural percentages on the PDP of the Natural Products, as discussed herein.

40. Consumers, including Plaintiff Howard, were exposed to the same material misrepresentations, as materially similar labels were placed on all Natural Products sold—and currently sold—throughout the United States, including in California.

41. As a consequence of Defendant's unfair and deceptive practices, Plaintiff Howard and other similarly situated consumers purchased the Natural Products under the false impression and in reliance upon Defendant's representations that the Natural Products contained more natural ingredients than they actually do.

42. As a result, Plaintiff Howard and other similarly situated consumers overpaid for the Natural Products, purchased the Natural Products over the products of competitors, and/or purchased the Natural Products under the belief that the products they purchased were more natural than they actually are.

43. Had Plaintiff Howard and other similarly situated consumers known that the Natural Products contained fewer natural ingredients, in either quantity or percentage, than the percentages represented on the PDPs, they would not have purchased the Natural Products.

44. As a result of Defendant's false, unfair, and deceptive statements, and/or their failure to disclose the true percentage of natural ingredients in the Natural Products, along with the other conduct described herein, Plaintiff Howard and similarly situated consumers purchased hundreds of thousands of units of the Natural Products across the United States, including in California, and have suffered, and continue to suffer, harm, including the loss of money and/or property.

45. Defendant's conduct regarding the labeling, marketing, and sale of the Class Products, as alleged herein, violates multiple federal and California laws, rules, and regulations, as detailed below.

46. This action seeks, among other things, equitable and injunctive relief; public

injunctive relief; restitution of all amounts unlawfully retained by Defendant; and disgorgement of all ill-gotten profits resulting from Defendant's alleged wrongdoing.

47. Unless enjoined, Defendant's unfair, deceptive and unlawful conduct will continue into the future, and Plaintiffs and Class members will continue to suffer harm.

## FACTUAL ALLEGATIONS

48. Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further allege as follows:

49. At all relevant times, including as of the filing of this Complaint, Defendant has made material misrepresentations regarding the Class Products.

### A. False and Unqualified U.S. Origin Claims

50. Defendant produces, markets, and advertises all or nearly all of its products, including the products purchased by Plaintiffs, as "Made in the USA," without clear or adequate qualification.

51. Despite their unqualified "Made in the USA" representations, the MUSA Products are made using numerous ingredients and components that are neither domestically grown, sourced, nor produced.

52. Regardless of where the Defendant placed its unqualified "Made in the USA" representations on the MUSA Products, these representations would still violate the MUSA Rule as discussed above.

53. However, in the case of the MUSA Products, the claim is highly impactful and intentionally placed on the PDP—the most prominent and conspicuous location for a consumer packaged goods company to present a claim.

54. A product's PDP is the part that faces the consumer when placed on a shelf or displayed on a website, allowing the consumer to view its claims without needing to turn the product around.

55. Consumer packaged goods companies typically place what they consider to

KAZEROUNI LAW GROUP, APC

be their most important and highest-value selling points on a product's PDP.

56. In the case of the MUSA Products, the Defendant's unqualified claim appears directly above one of the most important features of a product's PDP—the size or quantity of the product. The claim is presented in capitalized text stating "MADE IN THE USA," isolated from other wording and displayed in contrasting text, further reinforcing the Defendant's intent to convey that the MUSA Products and their ingredients are of U.S. origin.

57. Below are non-exhaustive examples of the aforementioned representation that appears on the PDPs of the MUSA Products:




KAZEROUNI LAW GROUP, APC




58. This representation is prominently displayed in the same location on the packaging of all MUSA Products or, in some cases, in another conspicuous location on the product label.

59. As a result of the "Made in the USA" representations on the MUSA Products' PDPs, online retailers have further propagated this misrepresentation through their websites' product pictures and descriptions, in addition to continuing to sell the MUSA Products with unqualified "Made in the USA" misrepresentations on their shelves, where applicable.

60. Below are non-exhaustive examples of the aforementioned representations that appear on third-party retailers' websites[6]:

---

[6] *See* https://www.walgreens.com/store/c/chi-infra-texture-dual-action-hair-spray/ID=prod6025278-product; and https://www.target.com/p/chi-keratin-shampoo-conditioner-64-fl-oz-2pc/-/A-80022901#lnk=sametab







61. Upon information and belief, the unqualified "Made in the USA" claim, or a similar representation, was also made on another panel of certain MUSA Products.

62. As a result of the unqualified U.S. origin claims on the MUSA Products' packaging, consumers have been misled for years, leading to both initial and repeat purchases of products they believed were made in the United States with ingredients and components sourced from the U.S.

63. Despite the prominent and unqualified claim that the MUSA Class Products were "Made in the USA," they are substantially made with foreign ingredients and



KAZEROUNI LAW GROUP, APC

components, a fact that is not properly disclosed on the label, as required by the MUSA Rule and California law.

64. For example, the CHI Infra Silk Infusion purchased by Plaintiff Torres contains hydrolyzed silk[7] which does not originate from the United States.

65. Hydrolyzed silk is not a minor, incidental, or background ingredient in Defendant's CHI Infra Silk Infusion product. It is expressly featured in the product's name, is repeatedly highlighted in Defendant's marketing as a primary functional protein, and is promoted as a key driver of the product's strengthening, smoothing, and restorative performance.[8] Because silk is deliberately positioned as a core benefit-conferring ingredient that defines the product's identity and consumer appeal, its foreign origin is material to reasonable consumers and to the legality of Defendant's unqualified "Made in the USA" representation.

66. Hydrolyzed silk is listed as the fifth ingredient out of seventeen total ingredients in the formulation of Defendant's CHI Infra Silk Infusion product, placing it well above numerous preservatives, fragrances, and minor additives. By virtue of its prominent placement in the ingredient list, hydrolyzed silk is necessarily present in a greater proportion than at least twelve other ingredients, confirming that it is not a *de minimis* or trace component of the product's formulation.

67. The sourcing and manufacturing origin of the ingredients that precede hydrolyzed silk in the ingredient list, including C13-14 Isoalkane, Isododecane, Dimethiconol, and C12-15 Alkyl Benzoate, cannot be determined through any

[7] For brevity and clarity within the body of the First Amended Complaint, substantiation regarding the origin of materials is set forth in **Exhibit A**. Products purchased by Plaintiffs appear at the beginning of the list of Class Products with their corresponding ingredient disclosures.

[8] *See* https://chi.com/s/CHIFaroukUS/shop/categories/hair-care/leave-in-conditioner/infra-silk-infusion---12-ounces/CHI0312.html. Notably, the term "Silk" appears twice on the CHI Infra Silk Infusion product's PDP alone, once in the product name itself and again immediately beneath the name in the product description, which references a "silk reconstructing complex." This repeated, front-of-label emphasis further confirms that silk is presented to consumers as a defining and value-driving feature of the product.

publicly available information. This critical information is within the exclusive knowledge, custody, and control of Defendant and its agents, making it impossible for Plaintiffs to plead these facts without discovery. The same is true for the ingredients that follow hydrolyzed silk. Moreover, many of the ingredients at issue are synthetic or chemically processed compounds whose geographic origin cannot be determined from their chemical names alone, and their true source can only be verified through Defendant's internal Certificates of Analysis or Certificates of Conformity ("COA"), which are solely within Defendant's possession. Upon information and belief, many of these additional ingredients and components, including the product's packaging,[9] are also not sourced from the United States.

68. Even apart from the undisclosed sourcing of the remaining formulation inputs and components, Defendant's violation of the MUSA Rule is apparent from the inclusion of hydrolyzed silk alone. Hydrolyzed silk is a central, functional, and performance-driving ingredient that Defendant intentionally features in the product's name, promotional claims, and marketing materials, and it appears in the top third of the product's ingredient list. Its foreign origin therefore constitutes more than a *de minimis* amount of foreign content as contemplated by the MUSA Rule for purposes of an unqualified U.S.-origin claim. Because Defendant knowingly uses and highlights an indispensable foreign ingredient in its CHI Infra Silk Infusion product, its unqualified "Made in the USA" representation is false, misleading, and unlawful on its face.

---

[9] Publicly available import and shipping records identify "Tricorbraun Hong Kong Corporation" as one of the top foreign entities associated with Farouk Systems, Inc. based on documented Bills of Lading. Bills of Lading are legally operative shipping records that identify the shipper, consignee, point of origin, destination, and the nature of goods transported in international commerce. Tricorbraun is one of the world's largest suppliers of rigid packaging, including plastic bottles and containers used for hair care products of the type manufactured and distributed by Defendant. These records therefore strongly support the inference that Defendant's plastic product packaging is sourced from outside the United States. *See* https://www.importinfo.com/farouk-systems-inc; *see* also https://www.tricorbraun.com/case-studies-personal-care

69. To the extent Defendant may seek to rely on California's five percent and ten percent statutory safe harbors for foreign content, those provisions afford no defense under the facts alleged. The foreign origin of hydrolyzed silk alone exceeds the type of incidental, negligible, or functionally insignificant content the safe harbors were intended to excuse, particularly because Defendant markets the ingredient as a primary performance driver and incorporates it into the product's identity. Further, the information necessary to determine the aggregate percentage and cost contribution of all foreign-sourced ingredients and components is uniquely within Defendant's possession, including its internal COAs and supplier records. Having produced no support establishing compliance with the statutory thresholds, Defendant cannot invoke the safe harbors to legitimize its unqualified U.S.-origin claims.

70. Defendant's CHI Keratin Reconstructing Shampoo product purchased by Plaintiff Howard contains, among other non-domestically sourced ingredients and components, cocamidopropyl betaine, keratin amino acids, hydrolyzed *Ceratonia siliqua* seed extract, *Argania spinosa* kernel oil (also known as *Sideroxylon spinosum*), *Simmondsia chinensis (Jojoba) seed oil*, hydrolyzed silk, panthenol, and guar hydroxypropyltrimonium chloride, none of which originate from the United States. Despite the presence of these foreign-sourced ingredients, the product's packaging prominently displays the unqualified representation "Made in the USA" without any clear or adequate disclosure.

71. The first ingredient in the CHI Keratin Reconstructing Shampoo is water, a non-functional diluent with little to no independent value or cost.[10] By contrast, the

[10] Given the location of Defendant's manufacturing facilities in Houston, Texas, publicly available data confirms that commercial water supplied by municipal utilities in the Houston area is negligible in cost. Although Houston Public Works does not clearly publicly publish per 1,000-gallon rates for commercial users, the nearby City of Southside Place, which purchases its water from the City of Houston, does publish such rates. As of 2025, the published commercial rate is approximately $9.10 per 1,000 gallons. Even assuming, counterfactually, that a single 32-ounce bottle of the CHI Keratin Reconstructing Shampoo contained a full gallon of water, the resulting water cost would amount to less than one cent. Accordingly, water does not materially contribute



KAZEROUNI LAW GROUP, APC

foreign-sourced functional ingredients in the product are positioned prominently throughout the ingredient list. Cocamidopropyl betaine appears as the third ingredient, keratin amino acids as the seventh, hydrolyzed *Ceratonia siliqua* seed extract as the eighth, *Argania spinosa* kernel oil as the ninth, *Simmondsia chinensis* (Jojoba) seed oil as the tenth, hydrolyzed silk as the eleventh, panthenol as the twelfth, and guar hydroxypropyltrimonium chloride as the twenty-ninth ingredient out of thirty-six total ingredients. With the exception of guar hydroxypropyltrimonium chloride, each of these foreign ingredients appears within the top one-third of the formulation, well above numerous preservatives, fragrances, stabilizers, and minor additives. By virtue of their placement and functional role, these foreign ingredients are necessarily present in greater proportions than at least twenty-four other ingredients in the formulation, confirming that they are not *de minimis* or trace components of the product.

72. Importantly, keratin is not a minor, incidental, or background ingredient in Defendant's CHI Keratin Reconstructing Shampoo. It is expressly featured in the product's name, is prominently displayed as the second most conspicuous text on the product's PDP in all capital letters, and is repeatedly emphasized throughout Defendant's marketing as the primary reconstructing and strengthening agent in the formulation.[11] Defendant specifically promotes keratin as the key ingredient responsible for repairing damage, restoring strength, and improving the structure and resilience of the hair.[12] Because keratin is deliberately positioned as a core, benefit-conferring ingredient that defines the product's identity, function, and consumer appeal, its foreign origin is material to reasonable consumers and to the

---

to the product's cost structure or consumer value and cannot be used to dilute or offset the economic and functional significance of Defendant's foreign-sourced ingredients for purposes of any U.S.-origin analysis. *See* https://www.southsideplacetx.gov/609/Public-Utilities; *see* also https://www.houstonsecured.org/docs/2025_APRIL_WATER_RATES.pdf

[11] *See* https://chi.com/s/CHIFaroukUS/shop/categories/hair-care/shampoo-conditioner/shampoo/keratin-reconstructing-shampoo---12-ounces/CHI0213.html

[12] *Id.*



KAZEROUNI LAW GROUP, APC

legality of Defendant's unqualified "Made in the USA" representation.

73. The sourcing and manufacturing origin of many of the ingredients and components in Defendant's CHI Keratin Reconstructing Shampoo cannot be determined through publicly available information. This critical information is exclusively within Defendant's knowledge, custody, and control, including through its internal COAs and supplier records. Several of these ingredients are synthetic or chemically processed compounds whose geographic origin cannot be determined from their chemical names alone. Even apart from these undisclosed formulation inputs and component origins, Defendant's violation of the MUSA Rule is independently established by its use of keratin alone, which is a central, functional, and performance-driving ingredient that Defendant prominently features in the product's name and marketing and presents as the primary reconstructing agent in the formulation. Keratin's foreign origin, along with the foreign origin of cocamidopropyl betaine, hydrolyzed *Ceratonia siliqua* seed extract, *Argania spinosa* kernel oil, *Simmondsia chinensis* (jojoba) seed oil, hydrolyzed silk, panthenol, and guar hydroxypropyltrimonium chloride, constitutes more than a *de minimis* amount of foreign content for purposes of an unqualified U.S.-origin claim. To the extent Defendant may seek to rely on California's five percent and ten percent statutory safe harbors, those provisions afford no defense under the facts alleged, particularly where Defendant markets certain foreign ingredients as core, benefit-conferring components of the product and has produced no support establishing compliance with any statutory threshold.

74. Defendant's CHI INFRA Thermal Protective Treatment product purchased by Plaintiff Howard contains hydrolyzed silk, panthenol, *Anthemis nobilis* flower extract, *Lavandula angustifolia* (lavender) flower extract, *Mentha piperita* (peppermint) leaf extract, *Salvia sclarea* (clary) extract, and *Olea europaea* (olive) fruit oil, each of which is not sourced from the United States. Despite the presence of these foreign-sourced ingredients, the product's PDP prominently displays the

KAZEROUNI LAW GROUP, APC

unqualified representation "Made in the USA." Upon information and belief, the product also contains additional foreign-sourced ingredients and components, including its packaging.

75. The first ingredient in the CHI INFRA Thermal Protective Treatment is water, a non-functional diluent with little to no independent value or cost. By contrast, the foreign-sourced functional ingredients in the product are positioned prominently within the upper portion of the ingredient list. Hydrolyzed silk appears as the seventh ingredient, panthenol as the eighth, *Anthemis nobilis* flower extract as the ninth, *Lavandula angustifolia* (lavender) flower extract as the tenth, *Mentha piperita* (peppermint) leaf extract as the eleventh, *Salvia sclarea* (clary) extract as the twelfth, and *Olea europaea* (olive) fruit oil as the fourteenth ingredient out of thirty total ingredients. Collectively, these foreign ingredients occupy a contiguous block in the top half of the formulation, well above numerous preservatives, fragrances, stabilizers, and minor additives. By virtue of their placement and functional role, these foreign ingredients are necessarily present in greater proportions than at least sixteen other ingredients in the product, confirming that they are not *de minimis* or trace components of the formulation.

76. Defendant affirmatively highlights silk in connection with the CHI INFRA Thermal Protective Treatment as a performance-driving component of the product's formulation through its marketing imagery. Specifically, in the scrolling images displayed on the product's webpage, Defendant features silk alongside the claim that it "protects and maintains hair's strength and resilience."[13] This representation reinforces that silk is promoted to consumers as a functional and benefit-conferring ingredient, not as a background or incidental component. Accordingly, silk is deliberately positioned by Defendant as material to the product's performance and

[13] *See* https://chi.com/s/CHIFaroukUS/shop/categories/hair-care/treatments/infra-thermal-protective-treatment---32-ounces/CHI0134.html

KAZEROUNI LAW GROUP, APC

consumer appeal. Below is an example of the image from the CHI INFRA Thermal Protective Treatment webpage:




77. The sourcing and manufacturing origin of many of the ingredients and components in Defendant's CHI INFRA Thermal Protective Treatment cannot be determined through publicly available information. This critical information is exclusively within Defendant's knowledge, custody, and control, including through its internal COAs and supplier records. Several of these ingredients are synthetic or chemically processed compounds whose geographic origin cannot be determined from their chemical names alone. Even apart from these undisclosed formulation inputs and component origins, Defendant's violation of the MUSA Rule is

KAZEROUNI LAW GROUP, APC

independently established by its use of multiple foreign ingredients and foreign-sourced packaging components. Hydrolyzed silk's foreign origin, along with the foreign origin of panthenol, *Anthemis nobilis* flower extract, *Lavandula angustifolia* (lavender) flower extract, *Mentha piperita* (peppermint) leaf extract, *Salvia sclarea* (clary) extract, and *Olea europaea* (olive) fruit oil, constitutes more than a *de minimis* amount of foreign content for purposes of an unqualified U.S.-origin claim. To the extent Defendant may seek to rely on California's five percent and ten percent statutory safe harbors, those provisions afford no defense under the facts alleged, particularly where Defendant markets the product as "Made in the USA," without qualification, and has produced no support establishing compliance with any statutory threshold.

78. Virtually every other hair care product sold by Defendant makes the same unqualified "Made in the USA" claim despite containing foreign ingredients, including key, featured ingredients such as silk, keratin, and coconut oil.[14] By way of non-exhaustive example, Defendant's BioSilk Silk Therapy Shampoo[15] and BioSilk Silk Therapy Conditioner[16] both contain hydrolyzed silk, among other foreign ingredients and components. With respect to keratin, Defendant's CHI Keratin K-Trix 5 Smoothing Treatment+[17] contains keratin, and Defendant's CHI Keratin Silk Infusion[18] contains both keratin and silk, along with additional foreign ingredients and components. With respect to coconut oil, Defendant's BioSilk Silk Therapy With Natural Coconut Oil Moisturizing Shampoo,[19] BioSilk Silk Therapy

---

[14] *See* **Exhibit A** for a representative list of the MUSA Products and their corresponding ingredient disclosures, with foreign-sourced ingredients specifically identified.

[15] *See* https://chi.com/s/CHIFaroukUS/shop/categories/hair-care/shampoo-conditioner/shampoo/biosilk-silk-therapy-shampoo---34-ounces/BSSTS34.html

[16] *See* https://chi.com/shop/categories/hair-care/shampoo-conditioner/conditioner/biosilk-silk-therapy-conditioner/4023.html

[17] *See* https://chi.com/s/CHIFaroukUS/shop/categories/hair-care/treatments/keratin-k-trix-5-smoothing-treatment/CHIKT4.html

[18] *See* https://chi.com/s/CHIFaroukUS/shop/categories/hair-care/leave-in-conditioner/keratin-silk-infusion---6-ounces/CHI0216.html

[19] *See* https://chi.com/s/CHIFaroukUS/shop/categories/hair-care/shampoo-



KAZEROUNI LAW GROUP, APC

With Natural Coconut Oil Moisturizing Conditioner,[20] and BioSilk Silk Therapy With Natural Coconut Oil Leave-In Treatment[21] all contain both silk and coconut oil, among other foreign ingredients and components. Despite the presence of numerous foreign ingredients and components, including key and featured ingredients, each of the foregoing products prominently displays the unqualified "MADE IN THE USA" claim in capital letters in the same location on the PDP of each product, in violation of the laws discussed herein, like all of Defendant's other hair care products do.

79. Defendant's noncompliance with the laws governing "Made in the USA" claims is further underscored by the fact that it continues to sell products bearing the same unqualified "Made in the USA" representations in jurisdictions where no statutory safe harbors exist at all, including Texas. Because the federal MUSA Rule applies nationwide and imposes independent and strict requirements for unqualified U.S.-origin claims, Defendant's continued nationwide use of the same unqualified labeling, including through its website which markets and sells products to consumers throughout the United States, confirms that Defendant is not attempting to comply with federal law. This uniform nationwide conduct makes it not merely plausible, but probable, that Defendant's products also fail to comply with the applicable California laws governing "Made in the USA" representations, including statutory safe harbors.

80. By failing to disclose the use of foreign ingredients and components, Defendant has unfairly and deceptively misrepresented the MUSA Products as being of purely U.S. origin.

81. Other ingredients and components cannot be definitively traced through

---

conditioner/shampoo/silk-therapy-with-natural-coconut-oil-moisturizing-shampoo---2.26-ounces/BSTOCS2.html

[20] *See* https://chi.com/shop/categories/hair-care/shampoo-conditioner/conditioner/silk-therapy-with-natural-coconut-oil-moisturizing-conditioner/4211.html

[21] *See* https://chi.com/shop/categories/hair-care/leave-in-conditioner/silk-therapy-with-natural-coconut-oil-leave-in-treatment/3988.html



KAZEROUNI LAW GROUP, APC

publicly available information. However, upon information and belief, the MUSA Products contain numerous ingredients and components, including custom plastic packaging manufactured for Defendant, that are not made in or sourced from the United States. These important facts are within the exclusive knowledge, control, and possession of Defendant, its suppliers and its contract manufacturers, and cannot be fully ascertained or alleged without the benefit of discovery.Nevertheless, Defendant's blatant and willful disregard for the laws discussed herein is well established by the aforementioned, non-exhaustive examples.[22]

82. The ratio of the ingredients in the Howard Products and Torres Products and the MUSA Products is exclusively within the knowledge, control and possession of Defendant and its agents. Without knowledge of the actual ratio or concentration of each ingredient in each MUSA Product, Plaintiff cannot calculate the relative cost contribution of each component or group of components to the overall product.

83. The exact cost of each individual ingredient and component used to produce the MUSA Products is within the exclusive knowledge, control, and possession of Defendant and its agents. Plaintiff has no means to determine or approximate those costs with precision. Even if approximate market prices for certain ingredients or components were available online, Plaintiff could not reasonably estimate what Defendant actually paid, as such costs depend on Defendant's undisclosed bargaining power and supplier relationships.

84. The identities of Defendant's suppliers, contract manufacturers, and other agents involved in the production of the MUSA Products are not publicly available and are presently unknown to Plaintiff, making it impossible for Plaintiff to plead these details without discovery. Such facts, along with other material information,

---

[22] *See* **Exhibit A**, which demonstrates the numerosity and prevalence of foreign components across the MUSA Products. Even on the information presently available, it is implausible that these foreign ingredients account for less than ten percent of the cost or value of each MUSA Product and certainly more than a *de minimus* amount of each MUSA Product. Discovery will further substantiate this allegation and reveal the full extent of foreign-sourced components, information uniquely within Defendant's knowledge, possession, and control.

can be readily obtained through discovery from Defendant and its agents.

85. There is no reliable, competent, or commercially available laboratory testing method capable of determining the country of origin of ingredients from finished consumer products. Origin determinations depend on supply-chain documentation, sourcing records, and manufacturer-controlled COAs and supplier disclosures, all of which are exclusively within Defendant's possession. Plaintiffs therefore cannot obtain this information through testing, and the truth or falsity of Defendant's sourcing representations can only be verified through discovery of Defendant's and its agents' records.

86. Most consumers have limited awareness that products, along with their ingredients and components, labeled as made in the United States may, in fact, contain ingredients or components sourced, grown, or manufactured in foreign countries. This is a material factor in many purchasing decisions, as consumers believe they are buying superior goods while supporting American companies and jobs.

87. American consumers generally perceive products, ingredients, and components of U.S. origin as being of higher quality than their foreign counterparts.

88. The United States possesses the climate, agricultural capacity, processing infrastructure, natural resources, and manufacturing capabilities necessary to grow, process, manufacture, and source many, if not all, of the foreign components used by Defendant. Defendant could have required its manufacturers and suppliers to partner with American farmers and producers to establish domestic supply chains for the ingredients used in the MUSA Products. Instead, upon information and belief, Defendant chose not to do so, thereby undermining the very purpose of both federal and state "Made in the USA" laws: to encourage the development of resilient domestic supply chains, support the American economy, create domestic jobs and to ensure consumers are fully informed when foreign ingredients and components are used in consumer products.

89. On information and belief, Defendant either charged a premium for the MUSA Products compared to its competitors or gained a competitive advantage by having the MUSA Products chosen over others based on false, unqualified "Made in the USA" claims. Federal rules and California laws are designed to protect consumers from such false representations and predatory conduct.

90. Had Plaintiffs and other consumers similarly situated been made aware that the MUSA Products contained a substantial amount of ingredients and components sourced from outside of the United States, they would not have purchased the MUSA Products or paid less for them.

91. Defendant possesses superior knowledge of many facts, which were not disclosed, thereby tolling the applicable statute of limitations.

**B. False "Natural" Claims**

92. Defendant produces, markets, and advertises certain of its products, including the products purchased by Plaintiff Howard, as being made with a specified percentage of natural ingredients

93. Consumers, such as Plaintiff Howard, increasingly seek products marketed as "natural" because they believe these products are safer, healthier, and free from synthetic, chemically derived, or harmful ingredients. The growing demand for "natural" products is rooted in a desire for cleaner, more transparent options that align with a healthier lifestyle, including concerns about environmental sustainability and the reduction of exposure to potentially harmful chemicals.

94. As a result, "natural" claims have become a significant factor in purchasing decisions, influencing consumers to choose products they believe are more environmentally friendly or beneficial to their overall well-being.

95. Aware of this trend, Defendant sought to capitalize on consumers' preferences by promoting the Natural Products not merely with a vague or general "natural" or "natural-derived" claims, but with highly specific assertions of a high percentage of the product being "natural."

96. The term "natural" conveys to a reasonable consumer that ingredients, such as those used in Natural Products, are not chemically or synthetically processed or produced, are derived from nature without the use of synthetic chemicals, and are not so highly processed that any connection to natural ingredients is completely lost.

97. A reasonable consumer understands that when they purchase a product, especially a personal care product, that claims to be "natural," they are reducing their exposure to chemicals and contributing to the reduction of chemical use in the consumer goods industry, thereby helping the environment.

98. Similar to its placement of the "Made in the USA" claim on the PDPs of the MUSA Products, Defendant prominently displays specific percentage "natural" claims on the PDPs of the Natural Products.

99. Below are non-exhaustive examples of the aforementioned representation that appears on the packaging of the Natural Products.

KAZEROUNI LAW GROUP, APC







KAZEROUNI LAW GROUP, APC









KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC







100. Defendant's misleading percentage natural representations were designed to convince consumers that the Natural Products were composed of a greater

proportion of natural ingredients than they actually contained, thus exploiting consumers' trust in the "natural" label and influencing their purchasing decisions.

101. Despite their "natural" percentage claims, the Natural Products, including those purchased by Plaintiff Howard, contain too many chemically or synthetically derived ingredients, or ingredient so highly processed, that any connection to nature is completely lost. As a result they cannot be the stated percentage of natural as they purport to be.

102. As non-exhaustive examples of Defendant's "natural" misrepresentations, the bolded ingredients in the product ingredient lists below are not natural, yet Defendant claims that these products are 90% or more natural. Underlined ingredients may be either synthetic or natural.

**CHI Keratin Reconstructing Shampoo (90% Natural Claim)**

Aqua/Water/Eau, **Sodium C14-16 Olefin Sulfonate**, [23] **Cocamidopropyl Betaine**, Glycerin, **Acrylates Copolymer**, **Polysorbate 20**, Keratin Amino Acids, Hydrolyzed Ceratonia Siliqua Seed Extract, Argania Spinosa Kernel Oil, Simmondsia Chinensis (Jojoba) Seed Oil, Hydrolyzed Silk, **Panthenol**, **Disodium Laureth Sulfosuccinate**, **Caprylyl Glycol**, **Phenoxyethanol**, **Polyquaternium-10**, **Disodium EDTA**, **Glycol Distearate**, **Linoleamidopropyl PG-Dimonium Chloride Phosphate**, **PEG-8 Methyl Ether Dimethicone**, **Potassium Sorbate**, **PEG-150 Pentaerythrityl Tetrastearate**, **Hexylene Glycol**, **Steareth-4**, **PEG-6 Caprylic/Capric Glycerides**, **Citric Acid**, **Polyquaternium-7**, Zea Mays (Corn) Starch, **Guar Hydroxypropyltrimonium Chloride**, Fragrance (Parfum), Citronellol, **Geraniol**, Hexyl Cinnamal, **Hydroxycitronellal**, Limonene, Linalool

[23] For brevity and clarity within the body of the First Amended Complaint, substantiation regarding the synthetic status of the ingredients in the products purchased by Plaintiffs is set forth in Exhibit B. Plaintiffs' products appear at the beginning of Exhibit B, followed by the list of Natural Products with their corresponding ingredient disclosures.

<u>**CHI Infra Thermal Protective Treatment (92% Natural Claim)**</u>

Aqua/Water/Eau, <u>Cetearyl Alcohol</u>, **Cetyl Alcohol**, <u>Glycerin</u>, **Dicetyldimonium Chloride**, **Behentrimonium Chloride**, Hydrolyzed Silk, **Panthenol**, Anthemis Nobilis Flower Extract, Lavandula Angustifolia (Lavender) Flower Extract, Mentha Piperita (Peppermint) Leaf Extract, Salvia Sclarea (Clary) Extract, Symphytum Officinale Leaf Extract, Olea Europaea (Olive) Fruit Oil, **Amodimethicone**, **Caprylyl Glycol**, **Polysorbate 60**, **Phenoxyethanol**, **Quaternium-80**, **Polyquaternium-37**, **Propylene Glycol Dicaprylate/Dicaprate**, **Potassium Sorbate**, **Cetrimonium Chloride**, **Trideceth-10**, **Hexylene Glycol**, **PPG-1 Trideceth-6**, **Citric Acid**, <u>Fragrance (Parfum)</u>, **Benzyl Benzoate**, <u>Hexyl Cinnamal</u>

<u>**CHI Infra Moisture Therapy Shampoo (90% Natural Claim)**</u>

Aqua/Water/Eau, **Sodium C14-16 Olefin Sulfonate**, **Cocamidopropyl Betaine**, **Glycol Distearate**, **Disodium Laureth Sulfosuccinate**, Hydrolyzed Silk, **Panthenol**, Cocodimonium Hydroxypropyl Hydrolyzed Keratin, **Acrylates Copolymer**, **Caprylyl Glycol**, **Phenoxyethanol**, **PEG-150 Pentaerythrityl Tetrastearate**, **Polyquaternium-10**, **Disodium EDTA**, **PEG-6 Caprylic/Capric Glycerides**, **Potassium Sorbate**, **Hexylene Glycol**, **Citric Acid**, <u>Fragrance (Parfum)</u>, **Benzyl Benzoate**, <u>Hexyl Cinnamal</u>

103. In addition to the bolded ingredients above, fragrance, citronellol, geraniol, hexyl cinnamal, cetearyl alcohol, and cetyl alcohol are often created synthetically for consistency purposes.

104. Given the predominance and order of synthetic ingredients in the lists above, it is clear that the described products cannot be 90% (or more) natural. As the details regarding Defendant's specific formulations, including ingredient amounts, volumes, or other units of measure, are solely within Defendant's possession and control, discovery will corroborate these claims.

105. With respect to the CHI Keratin Reconstructing Shampoo, the second, third, fourth, fifth, and sixth ingredients out of thirty-six total ingredients are Sodium C14-16 Olefin Sulfonate, Cocamidopropyl Betaine, Glycerin, Acrylates Copolymer, and Polysorbate 20, each of which is either definitively synthetic or possibly the product of extensive chemical processing, as reflected in the bolded and underlined designations above. Additional definitively or possibly synthetic ingredients continue throughout the formulation, including Panthenol, Disodium Laureth Sulfosuccinate, Caprylyl Glycol, Phenoxyethanol, Polyquaternium-10, Disodium EDTA, Glycol Distearate, Linoleamidopropyl PG-Dimonium Chloride Phosphate, PEG-8 Methyl Ether Dimethicone, Potassium Sorbate, PEG-150 Pentaerythrityl Tetrastearate, Hexylene Glycol, Steareth-4, PEG-6 Caprylic/Capric Glycerides, Citric Acid, Polyquaternium-7, Guar Hydroxypropyltrimonium Chloride, Fragrance (Parfum), Citronellol, Geraniol, Hexyl Cinnamal, Hydroxycitronellal, Limonene, and Linalool. Given that a substantial portion of the upper, middle, and lower portions of the ingredient list consist of definitively or possibly synthetic ingredients, it is not merely plausible, but probable, that Defendant materially mischaracterized the nature of this product in order to support its “90% Natural” representation.

106. With respect to the CHI INFRA Thermal Protective Treatment, the second through sixth and eighth ingredients out of thirty total ingredients are Cetearyl Alcohol, Cetyl Alcohol, Glycerin, Dicetyldimonium Chloride, Behentrimonium Chloride, and Panthenol, each of which is definitively synthetic or chemically modified, as reflected in the bolded and underlined designations above. The formulation also includes additional definitively or possibly synthetic ingredients throughout the remainder of the ingredient list, including Amodimethicone, Caprylyl Glycol, Polysorbate 60, Phenoxyethanol, Quaternium-80, Polyquaternium-37, Propylene Glycol Dicaprylate/Dicaprate, Potassium Sorbate, Cetrimonium Chloride, Trideceth-10, Hexylene Glycol, PPG-1 Trideceth-6, Citric

KAZEROUNI LAW GROUP, APC

Acid, Fragrance (Parfum), Benzyl Benzoate, and Hexyl Cinnamal. Given the concentration of definitively or plausibly synthetic ingredients occupying the upper, middle and lower portions of the formulation, it is not merely plausible, but probable, that Defendant materially overstated the natural content of this product in order to support its "92% Natural" claim.

107. With respect to the CHI INFRA Moisture Therapy Shampoo, the second, third, fourth, fifth, and seventh ingredients out of twenty-one total ingredients are Sodium C14-16 Olefin Sulfonate, Cocamidopropyl Betaine, Glycol Distearate, Disodium Laureth Sulfosuccinate, and Panthenol, each of which is definitively synthetic or the product of extensive chemical processing, as reflected in the bolded designations in Exhibit B. These are followed by additional definitively or possibly synthetic ingredients throughout the formulation, including Acrylates Copolymer, Caprylyl Glycol, Phenoxyethanol, PEG-150 Pentaerythrityl Tetrastearate, Polyquaternium-10, Disodium EDTA, PEG-6 Caprylic/Capric Glycerides, Potassium Sorbate, Hexylene Glycol, Citric Acid, Fragrance (Parfum), Benzyl Benzoate, and Hexyl Cinnamal. Given that a substantial majority of the functional ingredients in this product are definitively or possibly synthetic, it is not merely plausible, but probable, that Defendant materially misrepresented the product's composition in order to support its "90% Natural" claim.

108. Generally ingredients identified by complex chemical nomenclature, including the presence of chemical prefixes, suffixes, modifiers, or numerical designations such as "di-," "-ane," "-ene," "-one," "-ol," "-ate," "-xyl," "-pyl," "PEG-," "quat," "poly-," and similar alphanumeric conventions, are almost invariably the product of synthetic chemistry or extensive industrial chemical processing. Unlike straightforward botanical names or simple oils and extracts (for example, "Argania Spinosa Kernel Oil"), these chemically descriptive terms reflect molecules that have been intentionally modified, reacted, ethoxylated, polymerized, esterified, quaternized, hydrogenated, or otherwise transformed through laboratory

KAZEROUNI LAW GROUP, APC

and industrial processes. As a result, ingredients bearing such chemical naming conventions are ordinarily understood by industry participants to be synthetic or highly chemically processed, even where they may originate from plant-based feedstocks at some earlier stage of production.

109. The precise chemistry, manufacturing processes, and sourcing of the ingredients used to formulate the Natural Products are not fully discernible from publicly available information and are exclusively within the knowledge, custody, and control of Defendant, its suppliers, and its agents. This includes, without limitation, the identity of precursor materials, the specific chemical reactions applied, the degree of chemical modification, the use of synthetic intermediates, and the origin and composition of each finished ingredient. Defendant, its suppliers, and its agents alone possess the relevant supplier disclosures, formulation records, manufacturing specifications, and Certificates of Analysis necessary to determine whether these ingredients are truly natural, synthetically derived, or chemically modified.

110. Nevertheless, Plaintiffs have alleged, based on ingredient identity, chemical nomenclature, publicly available information, and accepted industry standards, that these ingredients are synthetic or chemically modified and therefore not natural. To the extent Defendant contends otherwise, the specific proof necessary to confirm or rebut those contentions is uniquely within Defendant's possession and can only be obtained through discovery.

111. Plaintiffs and ordinary consumers are not experts in chemistry, chemical engineering, ingredient manufacturing, or global ingredient sourcing. The true nature, origin, and method of production of cosmetic ingredients cannot be discerned by ordinary consumers from ingredient names alone or from the face of a product label. Consumers reasonably rely on Defendant's express "natural" representations and implied messaging to convey that the ingredients in the product are, in fact, natural and not the product of extensive chemical modification or

KAZEROUNI LAW GROUP, APC

synthetic processing. Absent specialized technical knowledge and access to nonpublic supply chain records, consumers have no independent means to verify whether Defendant's "natural" claims are true.

112. There is no reliable, competent, or commercially available scientific or laboratory testing method capable of determining whether a finished cosmetic product or its individual ingredients are truly "natural" as opposed to synthetic or chemically modified. Determinations regarding the natural status of ingredients depend on knowledge of the upstream chemical reactions, processing methods, and supply chain history through which those ingredients were created, none of which are discernible from analysis of the finished product itself. As a result, the truth or falsity of Defendant's "natural" representations cannot be verified through consumer-accessible testing and can only be confirmed through discovery of Defendant's internal sourcing, manufacturing, and formulation records.

113. The specific ratios, concentrations, and relative weight percentages of the individual ingredients within Defendant's products are not publicly disclosed and are exclusively within Defendant's knowledge, custody, and control. This information is maintained in Defendant's internal formulation specifications, manufacturing records, and supplier agreements and is customarily protected by confidentiality and non-disclosure obligations. Absent unlawful means, Plaintiffs have no ability to access or independently determine the precise concentration or proportional contribution of any given ingredient within the finished products. Plaintiffs therefore cannot allege exact ratios or percentages at the pleading stage and must rely on ingredient order and reasonable scientific inferences until such information is produced in discovery.

114. Defendant possesses superior knowledge of the true facts, which were not disclosed, thereby tolling the applicable statute of limitations.

115. Defendant's misleading use specificed percentage "natural" claims on the Natural Products deceives consumers into purchasing items that do not meet their

expectations of natural ingredients, causing financial harm and undermining their trust in product labeling.

116. On information and belief, Defendant either charged a premium for the Natural Products compared to its competitors or gained a competitive advantage by having the Natural Products chosen over others based on false "natural" claims. California laws are designed to protect consumers from such false representations and predatory conduct.

117. Defendant has been on notice of the unlawful nature of its "Made in the USA" and "Natural" claims since at least August 2024, when it received Plaintiffs' pre-suit notice under the California Consumers Legal Remedies Act. Despite that notice, Defendant has failed to provide Plaintiffs or their counsel with any documentation substantiating the challenged claims, including any sourcing records, Certificates of Analysis, supplier disclosures, formulation data, or other materials that would support its representations. Instead, Defendant has issued only blanket denials of wrongdoing. Had Defendant possessed and produced competent substantiation supporting its claims, this litigation could have been avoided. Defendant's continued refusal to produce such documentation, despite clear notice and opportunity to do so, is telling.

## FACTS SPECIFIC TO PLAINTIFF MARIANA TORRES

118. On or about February 9, 2023, Plaintiff Torres searched online while at her home in Montclair, California looking to purchase hair care products that were made in the United States with ingredients sourced from the United States.

119. While browsing various hair care products available for purchase online, Plaintiff Torres reviewed information and marketing materials about Defendant's CHI Infra Silk Infusion (the "Infusion Product"), which, on its PDP, claimed to be "Made in the USA" without any qualification, despite containing foreign ingredients in its formulation.

120. Relying on the unqualified "Made in the USA" representation on the Infusion

KAZEROUNI LAW GROUP, APC

Product, as any reasonable consumer would, and seeking to purchase a product made in the United States with domestic ingredients—especially since it is a personal care product—Plaintiff Torres purchased the Infusion Product for approximately $25.99 (excluding tax and shipping) from Amazon for her personal use.

121. Plaintiff Torres's reliance on Defendant's unqualified "Made in the USA" representation was reasonable, as consumers are accustomed to seeing disclosures like "Made in the USA with globally sourced ingredients" or similar qualified variations on product packaging—if and when such U.S. origin claims are made. When consumers encounter an unqualified "Made in the USA" or similar claim, they reasonably assume the product contains no foreign-sourced ingredients or components.

122. Defendant's representations regarding the MUSA Products (including the Infusion Product) were unfair, deceptive, and misleading, as the MUSA Products were actually made with and/or contained ingredients or components sourced, grown, or manufactured outside the United States.

123. Accordingly, Defendant is not entitled to lawfully make unqualified representations that the products were "Made in the USA."

124. Such unqualified representations that the Infusion Product was made in the USA, without qualification, were material to Plaintiff Torres's decision to purchase the product.

125. Indeed, in deciding to purchase the Infusion Product, Plaintiff Torres relied on the labeling, marketing, and/or advertising prepared and approved by Defendant and its agents, as disseminated through the MUSA Products' packaging containing the misrepresentations alleged herein.

126. Had Plaintiff Torres known that the Infusion Product, the MUSA Products, and their ingredients were not actually of U.S. origin, she would not have purchased the Infusion Product.

127. In other words, Plaintiff Torres would not have purchased the Infusion Product but for the unqualified "Made in the USA" claim on the Infusion Product and MUSA Products.

128. As a result, Plaintiff Torres was harmed because Defendant took Plaintiff Torres's money due to its false, unqualified, unfair, and deceptive "Made in the USA" representations on the Infusion Product and MUSA Products.

129. Each time Plaintiff Torres and putative Class members purchased a MUSA Product, they relied on Defendant's unqualified U.S. origin representations in their purchasing decisions, as is typical of most U.S. consumers.

130. Consequently, Plaintiff Torres and other similarly situated consumers were deceived by Defendant's actions.

131. Plaintiff Torres believed, at the time of purchase, that the Infusion Product was of superior quality and that she was supporting U.S. jobs, the U.S. economy, the environment, and ethical working conditions by purchasing a product made with U.S.-sourced ingredients, rather than ingredients sourced, grown, or made outside the United States.

132. Ingredients and components grown or manufactured in the USA are subject to strict regulatory requirements, including, but not limited to, agricultural, environmental, labor, safety, ethical, and quality standards.

133. Foreign sourced, grown, or manufactured ingredients and components are not subject to the same U.S. standards and may pose greater risks to consumers, the environment, and the U.S. economy. This concern is especially significant for products intended for topical use, such as personal care products.

134. Additionally, foreign-sourced, grown, or manufactured ingredients and components are generally of lower quality and less reliable than their U.S. origin counterparts.

135. False, unqualified, unfair and deceptive representations that products are "Made in the USA" reduce overall customer satisfaction compared to if such

KAZEROUNI LAW GROUP, APC

products were genuinely made in the U.S. using ingredients and components sourced, grown, or made domestically.

136. As previously described, the MUSA Products, including the Infusion Product purchased by Plaintiff Torres, contain foreign ingredients and are not worth the purchase price paid by Plaintiff Torres and putative Class members.

137. The precise amount of damages will be proven at the time of trial.

138. Plaintiff Torres and Class members were harmed as a result of Defendant's false, unqualified, unfair and deceptive "Made in the USA" representations alleged herein.

139. This false, unfair, and deceptive advertising of the MUSA Products by Defendant presents an ongoing threat to consumers, as Defendant's conduct continues to this day.

## FACTS SPECIFIC TO PLAINTIFF CRYSTAL HOWARD

140. On or about August 5, 2024, while browsing hair care products at Marshalls in Sacramento, California, Plaintiff Howard observed three of Defendant's products available for purchase. The specific products were CHI Keratin Reconstructing Shampoo, CHI Infra Thermal Protective Treatment, and CHI Infra Moisture Therapy Shampoo (collectively, the "Howard Products").

141. Each of the Howard Products, as represented on their PDPs, indicated that they were a specified percentage "natural"[24] and were, without qualification, "Made in the USA."

142. Relying on the unqualified "Made in the USA" claim and the "natural" claims, as any reasonable consumer would, and intending to purchase a product that was both highly natural and made in the United States with domestic ingredients and components, Plaintiff Howard purchased the Howard Products for $7.99 each,

[24] Specifically, CHI Keratin Reconstructing Shampoo is represented as 90% natural, CHI Infra Thermal Protective Treatment as 92% natural, and CHI Infra Moisture Therapy Shampoo as 90% natural.



KAZEROUNI LAW GROUP, APC

excluding tax, from Marshalls for her personal use.

143. Despite Defendant's representations that the Howard Products are 90% or more natural and "Made in the USA" without clear and adequate qualification of foreign ingredients, the Howard Products are not as natural as claimed and each contains foreign ingredients and components.

144. Plaintiff Howard's reliance on Defendant's unqualified "Made in the USA" representation was reasonable, as consumers are accustomed to seeing disclosures like "Made in the USA with globally sourced ingredients" or similar qualified variations on product packaging-if and when such U.S. origin claims are made. When consumers encounter an unqualified "Made in the USA" or similar claim, they reasonably assume the product contains no foreign-sourced ingredients or components.

145. Similarly, Plaintiff Howard's reliance on the Howard Products' "90% (or more) natural" claims was reasonable, as consumers are not experts in the true nature or origins of ingredients and have no reason to doubt such claims or suspect that a manufacturer would deliberately misrepresent synthetic, chemically derived, or otherwise non-natural ingredients to claim a higher percentage of "natural" than the product actually contains, especially when such claims are prominently displayed on products' PDPs.

146. Defendant's unqualified "Made in the USA" representations regarding the Howard Products were false, unfair, deceptive, and misleading, as the Howard Products—and all other MUSA Products—are, in fact, made with foreign-sourced ingredients and components.

147. Defendant's "natural" representations were also false, unfair, deceptive, and misleading, as the Howard Products—and all other Natural Products—actually contain more synthetic, chemically derived, or otherwise non-natural ingredients than they purport, contrary to the Howard Products' "90% (or more) natural" claims.

148. Plaintiff Howard would not have purchased the Howard Products had she known that the products contained foreign-sourced ingredients or components and did not meet the percentage "natural" claims represented on their packaging.

149. As a result, Plaintiff Howard was harmed because Defendant misrepresented the Howard Products as both "Made in the USA," without qualification, and "90% (or more) natural," leading Plaintiff Howard to purchase the products under false pretenses.

150. Each time Plaintiff Howard and other similarly situated consumers purchased products like the Natural Products, they relied on Defendant's unqualified claims regarding the product's U.S. origin and percentage of natural ingredients, which misled them into believing they were purchasing a product that met these criteria.

151. Consequently, Plaintiff Howard and other similarly situated consumers were deceived by Defendant's actions and suffered harm as a result.

152. Upon information and belief, the Natural Products— including the ingredients used in these products—do not meet the quality or sourcing standards that consumers would expect from products claiming to be made in the USA, without qualification, or to contain a specified high percentage of natural ingredients.

153. The false, unqualified "Made in the USA" and false specified percentage "natural" claims diminished the overall value of the Howard Products for Plaintiff Howard and other similarly situated consumers, who believed they were purchasing a higher-quality, more natural product based on these misrepresentations.

154. Plaintiff Howard would not have purchased the Howard Products at the price paid, or at all, had she known that the products did not meet the expectations set by Defendant's false, unfair and deceptive marketing claims.

155. This false, unfair, and deceptive advertising of the Natural Products by Defendant continues to harm consumers and presents an ongoing threat, as Defendant's conduct persists to this day.

KAZEROUNI LAW GROUP, APC

## CLASS ALLEGATIONS

156. Plaintiffs bring this action on behalf of Plaintiffs and all others similarly situated.

157. Plaintiffs are members of and seek to represent a Class, pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All persons in California who purchased one or more of the Class Products, within four years prior to the filing of this Complaint, that were marketed or represented as "Made in the USA" or any derivative thereof on the product or in its marketing materials, but which contained ingredients or components not grown or manufactured in the USA.

158. Plaintiff Howard is a member of and seeks to represent a Sub-Class, pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All persons in California who purchased one or more of the Natural Products, within four years prior to the filing of this Complaint, that were marketed or represented as being made with a specified percentage of natural ingredients, or any derivative thereof, on the product or in its marketing materials, but which contained a higher proportion of synthetic, chemically derived, or otherwise non-natural ingredients than was represented by the stated percentage.

159. The Class and Sub-Class shall be referred to herein jointly as the "Class."

160. Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Further excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

161. Plaintiffs reserve the right to modify the proposed Class definition, including but not limited to expanding the Class to protect additional individuals and to assert additional sub-classes as warranted by additional investigation.

162. Numerosity: The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of members of the Class is unknown to Plaintiffs at this time, based on information and belief, the Class consists of thousands of individuals within California.

163. Commonality: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, without limitation:

- The nature, scope, and operations of the wrongful practices of Defendant;
- Whether the Class Products are or have been represented as being of U.S. origin without clear and adequate qualification;
- Whether the Natural Products are or have been marketed as more "natural" than they actually are;
- Whether Defendant knew or should have known that its business practices were unfair and/or unlawful;
- Whether Defendant was unjustly enriched by its unlawful, unfair and deceptive business practices;
- Whether Plaintiffs and members of the Class suffered monetary damages as a result of Defendant's conduct; and
- Whether Plaintiffs and members of the Class are entitled to injunctive relief, including public injunctive relief.

164. Typicality: Plaintiffs' claims are typical of those of the Class. Both Plaintiffs and all members of the Class have been harmed by Defendant's wrongful practices. Plaintiffs' claims arise from the same course of conduct that gave rise to the claims

KAZEROUNI LAW GROUP, APC

of the Class and are based on the same legal theories. Specifically, Plaintiffs purchased one or more Class Products from Defendant that were represented and/or advertised as: (1) "Made in the USA," or a derivative thereof, without clear and adequate qualification; and/or (2) more "natural" than they actually were, in the case of the Natural Products.

165. Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of members of the Class. Plaintiffs' Counsel are competent and experienced in litigating consumer class actions. Plaintiffs have retained counsel experienced in consumer protection law, including complex class action litigation involving unfair business practices. Plaintiffs have no adverse or antagonistic interests to those of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs' attorneys are not aware of any interests adverse or antagonistic to those of Plaintiffs and the proposed Class.

166. Predominance: Defendant has engaged in a common course of conduct toward Plaintiffs and members of the Class, in that Plaintiffs and members of the Class were induced to purchase the Class Products. The common issues arising from Defendant's conduct affecting members of the Class set out above predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

167. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most members of the Class would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action



KAZEROUNI LAW GROUP, APC

presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

168. Unless the Class is certified, Defendant will retain monies received as a result of Defendant's unlawful, unfair and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendant will also likely continue to advertise, market, label, promote and package the Class Products in an unlawful, unfair, deceptive and misleading manner, and members of the Class will continue to be deceived, misled, harmed, and denied their rights under California law.

169. Defendant has acted on grounds that apply generally to the Class, so that Class certification is appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violations of the Consumer Legal Remedies Act ("CLRA")
### (Cal. Civ. Code § 1750, *et seq*.)

170. Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further allege as follows:

171. California Civil Code Section 1750, *et seq.,* entitled the Consumers Legal Remedies Act ("CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer."

172. The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, *inter alia,* that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protections.

173. Defendant's actions, representations, and conduct have violated, and continue to violate the CLRA because they extend to transactions that intended to result, or which have resulted in the sale of haircare products to consumers.

174. Plaintiffs and the Class members are not sophisticated experts with independent knowledge of ingredient sourcing, product labeling and marketing practices.

175. Plaintiffs and the Class members are California consumers who purchased Class Products for personal, family or household purposes.

176. Defendant is a "person" as defined by Cal. Civ. Code § 1761(c).

177. The Class Products that Plaintiffs and other Class members purchased from Defendant constitute "goods" as defined pursuant to Civil Code Section 1761(a).

178. Plaintiffs, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).

179. Each of Plaintiffs' and the Class members' purchases of Defendant's products constituted a "transaction" as defined pursuant to Civil Code Section 1761(e).

180. Civil Code Section 1770(a)(2), (4), (5), (7) and (9) of the CLRA provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
> (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services;
> (4) Using deceptive representations or designations of geographic origin in connection with goods or services;
> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) Representing that goods or services are of a particular standard, quality, or grade…; [and]
> (9) Advertising goods or services with intent not to sell them as advertised.



KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

181. Defendant failed to comply with Civil Code Section 1770(a)(2), (4), (5), (7) and (9) by marketing and representing that the Class Products are "Made in the USA," without qualification, when in fact they actually contain foreign sourced, grown or made ingredients and/or components.

182. Additionally, Defendant violated Civil Code Section 1770(a)(2), (5), (7), and (9) by marketing and representing the Natural Products as more natural than they actually are. In reality, numerous synthetic, chemically derived, or otherwise non-natural ingredients in the Natural Products were deceptively characterized as "natural" to support misleading high-percentage natural claims.

183. Plaintiffs further allege that the Defendant committed these acts with full awareness of the harm it would cause and engaged in such unfair and deceptive conduct despite this knowledge.

184. Defendant knew or should have known that its representations about the Class Products, as described herein, violated federal regulations and state laws, including consumer protection laws, and that these statements would be relied upon by the Plaintiffs and Class members.

185. As a direct and proximate result of Defendant's violations of Cal. Civ. Code §§ 1750, *et seq*., Plaintiffs and each Class member have suffered harm by paying for the Class Products, which they would not have purchased had they known the products were unlawfully, unfairly, and deceptively labeled, contained foreign ingredients, and/or contained fewer natural ingredients than represented, in the case of the Natural Products.

186. Plaintiffs and the Class suffered monetary harm as a result of Defendant's conduct because: (a) they would not have purchased the Class Products on the same terms had it not been for Defendant's unlawful, unfair, and deceptive actions as set forth herein; (b) they paid a price premium for the Class Products or chose them over competing products due to Defendant's misrepresentations and deceptive

packaging, which falsely claimed the products were "Made in the USA" without qualification, despite the inclusion of foreign ingredients and components; and/or (c) the products contained fewer natural ingredients than represented, in the case of the Natural Products.

187. Plaintiffs were therefore harmed because their money was taken by Defendant as a result of Defendant's false and unqualified "Made in the USA" representation on the labels of the Class Products, as well as Defendant's misleading claims regarding the Natural Products, which were falsely represented as more "natural" than they actually were. These misrepresentations included the deceptive labeling of the Natural Products as containing a high percentage of natural ingredients, despite the presence of numerous synthetic, chemically derived, or otherwise non-natural ingredients.

188. Plaintiffs and Class members reasonably relied upon Defendant's representations regarding the Class Products, and Plaintiffs and the Class reasonably expected that the Class Products would not be unlawfully labeled in a unfair, deceptive and misleading manner.

189. Thus, Plaintiffs and the Class reasonably relied to their detriment on Defendant's unfair, deceptive and misleading representations.

190. Pursuant to California Civil Code § 1782(a), on or about August 16, 2024, Plaintiffs sent Defendant a notice and demand for corrective action (the "CLRA Demand") via certified mail, informing Defendant of its violations of the CLRA and demanding that they cease and desist from such violations, as well as make full restitution by refunding all monies received in connection therewith.

191. As the alleged violations were not cured by Defendant within 30 days of the CLRA Demand and remain unaddressed[25], Plaintiffs, on behalf of themselves and the Class, seek damages and attorneys' fees pursuant to California Civil Code § 1782(d).

[25] https://web.archive.org/web/20250306203204/https://chi.com/shop/categories/hair-care/

KAZEROUNI LAW GROUP, APC

192. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiffs and members of the Class are entitled to a declaration that Defendant violated the Consumer Legal Remedies Act.

193. Under Cal. Civ. Code § 1780(a) and (b), Plaintiffs and the putative Class are entitled to, and hereby seek, injunctive relief to prohibit such conduct in the future, as well as damages.

**SECOND CAUSE OF ACTION**
**Violations of California's Unfair Competition Law ("UCL")**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

194. Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further allege as follows:

195. Plaintiffs bring this claim individually and on behalf of the Class for Defendant's violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

196. Plaintiffs and Defendant are each "person[s]" as defined by California Business & Professions Code § 17201.

197. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

198. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising."

199. The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

200. Through the conduct alleged in detail above and herein, Defendant engaged in unlawful, unfair, deceptive and/or fraudulent business practices in violation of Bus. & Prof. Code § 17200, *et seq*.



KAZEROUNI LAW GROUP, APC

### A. *"Unlawful" Prong*

201. Defendant has committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code § 17200 *et seq.*

202. Defendant is alleged to have violated California law by falsely advertising, marketing, promoting, and selling the Class Products as "Made in the USA" without qualification of foreign ingredients and components, and by falsely advertising, marketing, promoting, and selling the Natural Products as more "natural" than they actually are.

203. Specifically, by manufacturing, distributing, and/or marketing the Class Products and the Natural Products with false, unfair and deceptive claims, Defendant violates California's CLRA, Civil Code § 1750, *et seq.*; California's Made in the USA Statute, Bus. & Prof. Code §§ 17533.7; and/or the federal Made in USA Labeling Rule, 16 C.F.R. Part 323.

204. Defendant falsely, unfairly and deceptively represents that the Class Products are "Made in the USA" without clear and adequate qualification, despite containing ingredients and/or components that are sourced, grown, or manufactured in foreign countries.

205. Additionally, Defendant falsely, unfairly and deceptively represents that the Natural Products are more "natural" than they actually are.

206. Aside from the unlawful conduct described herein, Defendant has other reasonably available alternatives to advance its business interests, such as accurately, truthfully, and lawfully marketing, labeling, and selling the Class Products.

207. Instead, Defendant deliberately and deceptively misled consumers through unlawful and unfair practices for its own economic gain.

208. Plaintiffs and Class members reserve the right to allege additional violations of law that constitute unlawful business practices or acts, as such conduct is ongoing and continues to this day.

**B. *"Unfair" Prong***

209. Defendant has engaged in acts of unfair competition prohibited by Bus. & Prof. Code § 17200, *et seq*.

210. Defendant engaged in a pattern of "unfair" business practices that violate both the letter and the intent of the statutes. Defendant's conduct threatens an incipient violation of the law or violates the policy and spirit of the law by manufacturing, distributing, and/or marketing its products with false, unfair and deceptive claims.

211. Additionally, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the aforementioned statutes. These practices, which are immoral, unethical, and unscrupulous, have caused harm to consumers and run counter to public policy. The utility of such conduct, if any, is far outweighed by the damage it causes, particularly through the manufacturing, distribution, and/or marketing of the Class Products with unqualified, unfair, and deceptive "Made in the USA" claims and/or false "natural" claims.

212. Defendant's conduct includes, but is not limited to, manufacturing, distributing, marketing, and/or advertising the Class Products with unqualified, unfair, and deceptive U.S. origin claims and/or false "natural" claims. As a result: (1) the injury to consumers was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was one that consumers could not have reasonably avoided.

213. Without limitation, Defendant's knowing mislabeling and false and unlawful marketing of the Class Products constitute unfair and deceptive business practices, misleading consumers into believing they are purchasing products that are "Made in the USA" without foreign ingredients and/or products that are more "natural" than they actually are.

214. Plaintiffs could not have reasonably avoided the resulting injury.

215. Plaintiffs reserve the right to allege additional conduct that constitutes further unfair business acts or practices.

### C. *"Fraudulent" Prong*

216. Defendant violated the "fraudulent" prong of the UCL by misleading Plaintiffs and the Class to believe that the Class Products and/or all its ingredients were made in the United States.

217. Particularly, the Class Products are falsely represented as "Made in the USA" without clear and adequate qualification, despite the fact that they contain foreign sourced, grown or manufactured ingredients and/or components.

218. Defendant also falsely represents the Natural Products as containing more "natural" ingredients than they actually do. Specifically, Defendant mischaracterizes certain ingredients as "natural" despite the fact that they are synthetic, chemically derived, or otherwise non-natural, to support its high-percentage natural claims.

219. After receiving and acknowledging Plaintiffs' CLRA notice and demand, and refusing to correct these underlying claims, Defendant has shown its intent to continue the fraudulent advertising discussed herein.

220. Relying on Defendant's misrepresentations, Plaintiffs purchased the Class Products.

221. Like Plaintiffs, Class members purchased the Class Products in reliance on Defendant's misrepresentations.

222. Plaintiffs and the Class are not sophisticated experts in ingredient sourcing, product labeling, marketing practices, or the regulations governing the Class Products.

223. Plaintiffs and members of the putative Class acted reasonably in purchasing the Class Products based on their belief that Defendant's representations were accurate, truthful and lawful.

224. Plaintiffs reserve the right to allege additional conduct that constitutes further fraudulent business acts or practices.

**D. *"Unfair, Deceptive, Untrue or Misleading Advertising" Prong***

225. Defendant's advertising is unfair, deceptive, untrue and misleading, as it leads consumers to believe that the Class Products are "Made in the USA" without clear and adequate qualification, despite containing foreign-sourced, grown, or manufactured ingredients and components. Defendant also falsely represents that the Natural Products contain more "natural" ingredients than they actually do.

226. Plaintiffs, as reasonable consumers, and the public were likely to be, and in fact were, deceived and misled by Defendant's labeling and marketing. They reasonably interpreted Defendant's representations according to their ordinary meaning—that the Class Products were "Made in the USA" without foreign ingredients or components, and/or that the Natural Products contained the stated percentage of "natural" ingredients.

227. Plaintiffs and the Class are not sophisticated experts in ingredient sourcing, product labeling, marketing practices, or the regulations governing the Class Products. They acted reasonably in purchasing the Class Products based on their belief that Defendant's representations were accurate, truthful and lawful.

228. Plaintiffs and the Class lost money or property as a result of Defendant's UCL violations because, at a minimum: (a) they would not have purchased the Class Products on the same terms had they known the true facts about Defendant's representations; (b) they paid a price premium for the Class Products due to Defendant's alleged misrepresentations; (c) the Class Products were not made in the USA with U.S.-sourced ingredients and components as represented; and/or (d) the Natural Products were not as "natural" as they purported to be.

229. Defendant's alleged unlawful, unfair, and deceptive business practices, along with their unfair, deceptive, untrue, or misleading advertising, present a continuing



KAZEROUNI LAW GROUP, APC

threat to the public as Defendant continues to engage in unlawful conduct that harms consumers.

230. Such acts and omissions by Defendant are unlawful, unfair, and/or deceptive, constituting violations of Business & Professions Code §§ 17200, *et seq*. Plaintiffs reserves the right to identify additional violations by Defendant as may be uncovered through discovery.

231. As a direct and proximate result of the acts and representations described above, Defendant has received and continues to receive unearned commercial benefits at the expense of its competitors and the public.

232. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct described herein, Defendant has been, and will continue to be, enriched by ill-gotten gains from customers, including Plaintiffs, who unwittingly provided money based on Defendant's misrepresentations.

233. Plaintiffs were harmed because Defendant took Plaintiffs' money through unqualified, false, unfair, and deceptive representations made regarding the Class Products.

234. The conduct of Defendant, as described above, demonstrates the need for injunctive relief to restrain such acts of unfair competition pursuant to California Business and Professions Code. Unless enjoined by the court, Defendant will retain the ability to, and may, continue engaging in unfair and deceptive competition and misleading marketing. As a result, Plaintiffs and the Class are entitled to both injunctive and monetary relief.

235. Plaintiffs would like to purchase the Class Products again but cannot be certain they will not be misled in the future unless and until Defendant makes the appropriate changes to the labeling and marketing of its Class Products, as requested herein.

236. Pursuant to Bus. and Prof. Code § 17203, Plaintiffs and the proposed Class are entitled to, and hereby seek, injunctive relief to prevent Defendant from



KAZEROUNI LAW GROUP, APC

continuing the conduct in question. Additionally, Plaintiffs seek public injunctive relief to prevent Defendant from marketing and selling products as "Made in the USA" without clear and proper qualification, and from selling products represented as more "natural" than they actually are.

237. In prosecuting this action to enforce important rights affecting the public interest, Plaintiffs seek the recovery of attorneys' fees and costs pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

## **THIRD CAUSE OF ACTION**
### **Violations of California's False Advertising Law ("FAL")**
### **(Cal. Bus. & Prof. Code §§ 17500, *et seq*.)**

238. Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein and further allege as follows:

239. California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, states that "[i]t is unlawful for any ... corporation ... with intent … to dispose of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement...which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading...."

240. Defendant's material misrepresentations and omissions, as alleged herein, violate Bus. & Prof. Code § 17500, *et seq*. Defendant knew or should have known that these misrepresentations and omissions were false, unfair, deceptive, and misleading. This includes the unqualified representation that the Class Products were "Made in the USA" despite containing foreign-grown, sourced, or manufactured ingredients and components, as well as the false representation that the Natural Products are more "natural" than they actually are.



KAZEROUNI LAW GROUP, APC

241. Plaintiffs and the Class suffered tangible, concrete injuries as a result of Defendant's actions, as set forth herein, because they purchased the Class Products in reliance on Defendant's misrepresentations.

242. As a result, pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs and members of the Class are entitled to injunctive relief, equitable relief, and restitution.

243. Further, Plaintiffs and the members of the Class seek an order requiring Defendant to disclose the misrepresentations and request an order awarding Plaintiffs restitution for the money wrongfully acquired by Defendant through those misrepresentations.

244. Additionally, Plaintiffs and the members of the Class seek an order requiring Defendant to pay attorneys' fees pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

## FOURTH CAUSE OF ACTION
## Breach of Express Warranty

245. Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein and further allege as follows:

246. Defendant represented to Plaintiffs and similarly situated consumers, through product packaging and marketing materials, that the Class Products were "Made in the USA" without any qualification and that the Natural Products contained more "natural" ingredients than they actually did.

247. Defendant's representations regarding the unqualified U.S. origin of the Class Products and the alleged "natural" percentage composition of the Natural Products constitute affirmations of fact.

248. Defendant's explicit claims that the Class Products are "Made in the USA" and that the Natural Products contain a specified percentage of "natural" ingredients pertain directly to the nature and composition of the products, forming a fundamental part of the bargain between Defendant and purchasers.

KAZEROUNI LAW GROUP, APC

249. Defendant's statements—featured prominently on the Class Products' PDP and marketing materials—constitute an express warranty regarding the products' U.S. origin, including their ingredients, as well as an express warranty that the Natural Products contain the stated percentage of "natural" ingredients.

250. Relying on these express warranties, Plaintiffs and Class members purchased the Class Products, believing these warranties.

251. Defendant breached its express warranties because the Class Products contained foreign-sourced ingredients and components, which were not disclosed with any qualification, contradicting Defendant's representations of an unqualified U.S. origin. Additionally, the Natural Products contained more non-natural ingredients than was purported on the products' labels.

252. As a result of Defendant's breach, Plaintiffs and Class members suffered harm and are entitled to recover either the full purchase price of the Class Products or the difference between their actual value and the value they would have held if Defendant's representations regarding the Class Products had been accurate, truthful, and lawful.

253. Plaintiffs and Class members did not receive the benefit of their bargain and sustained additional injuries, as alleged herein.

254. Had Plaintiffs and Class members known the true nature of the Class Products, they either would not have purchased the products or would not have paid the price Defendant charged.

255. Defendant's misrepresentations were a substantial factor in causing Plaintiffs and the Class economic harm.

**<u>FIFTH CAUSE OF ACTION</u>**
**Unjust Enrichment**

256. Plaintiffs plead this unjust enrichment cause of action in the alternative to contract-based claims.

257. Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further allege as follows:

258. Under California law, the elements of unjust enrichment are the receipt of a benefit and the unjust retention of that benefit at the expense of another.

259. Plaintiffs and members of the Class conferred non-gratuitous benefits upon Defendant by purchasing the Class Products, which Defendant misrepresented as to their origin, ingredients and "natural" status.

260. Plaintiffs and members of the Class allege that Defendant owes them money for the unjust conduct described herein that resulted in the wrongful acquisition of funds.

261. An undue advantage was taken of Plaintiffs' and the Class's lack of knowledge of the deception, resulting in money being extracted to which Defendant had no legal right.

262. Defendant is therefore indebted to Plaintiffs and members of the Class in a specific sum—the amount of money each paid for the Class Products, which Defendant should not retain in equity and good conscience.

263. Defendant is therefore liable to Plaintiffs and members of the Class for the amount of unjust enrichment.

264. Defendant's retention of any benefit, whether directly or indirectly collected from Plaintiffs and members of the Class, violates principles of justice, equity, and good conscience.

265. As a result, Defendant has been and continues to be unjustly enriched.

266. Plaintiffs and the Class are entitled to recover from Defendant all amounts that Defendant has wrongfully and improperly obtained, and Defendant should be required to disgorge to Plaintiffs and members of the Class the benefits is has unjustly received.

267. Defendant accepted and retained such benefits with knowledge that Plaintiffs' and members of the Class's rights were being violated for financial gain.

Defendant has been unjustly enriched by retaining the revenues and profits obtained from Plaintiffs and members of the Class, and such retention under these circumstances is both unjust and inequitable.

268. As a direct and proximate result of Defendant's unlawful practices and the retention of monies paid by Plaintiffs and members of the Class, Plaintiffs and the Class have suffered concrete harm and injury.

269. Defendant's retention of the non-gratuitous benefits conferred upon it by Plaintiffs and members of the Class would be unjust and inequitable.

270. Plaintiffs and members of the Class are entitled to seek disgorgement and restitution of wrongful profits, revenue, and benefits conferred upon Defendant, in a manner to be determined by this Court.

## SIXTH CAUSE OF ACTION
## Intentional Misrepresentation

271. Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further allege as follows:

272. Defendant knowingly represented to Plaintiffs and similarly situated individuals, through product labeling and marketing practices, that the Class Products were "Made in the USA" without any qualification regarding foreign ingredients, and that the Natural Products contained more "natural" ingredients than they actually did.

273. Defendant acted intentionally by willfully and purposefully disseminating misrepresentations about the Class Products through labeling, online and offline marketing, advertising, and social media.

274. However, as described above, Defendant's representations regarding the Class Products are false, unlawful, unfair, deceptive and/or misleading.

275. Defendant knew that its representations regarding the Class Products were false, unlawful, unfair, deceptive, and/or misleading, yet continued to make such

KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

representations over a period of years, including after receipt of Plaintiffs' CLRA notice and demand letter.

276. Defendant further knew that retailers were marketing the Class Products in false or misleading ways, as Defendant designed, manufactured, and affixed the product labeling to the Class Products before supplying them to the retailers.

277. Plaintiffs and the putative Class members saw, believed, and relied on Defendant's misrepresentations when deciding to purchase the Class Products.

278. As a direct and proximate result of Defendant's intentional misrepresentations, Plaintiffs and the putative Class members suffered damages in an amount to be determined at trial.

279. By engaging in the acts described above, Plaintiffs and the putative Class are entitled to recover exemplary or punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment against Defendant as follows, seeking equitable relief in the alternative to legal relief:

- Certification of this action as a class action;
- Appointment of Plaintiffs as Class Representative;
- Appointment of Plaintiffs' attorneys as Class Counsel;
- That Defendant's wrongful conduct alleged herein be adjudged and decreed to violate the consumer protection statutes asserted herein;
- An Order declaring that Defendant's conduct violated the CLRA, California Civil Code §§ 1750, *et seq.*, and awarding injunctive relief pursuant to Cal. Civ. Code § 1780(a) and (b);
- An Order declaring that Defendant's conduct violated California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*; and awarding injunctive relief pursuant to Bus. & Prof. Code § 17203;
- An Order requiring Defendant to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

- An Order requiring the imposition of a constructive trust and/or disgorgement of Defendant's ill-gotten gains, compelling Defendant to pay restitution to Plaintiffs and all members of the Class, and to restore to Plaintiffs and Class members all funds acquired through any act or practice declared by this Court to be unlawful, fraudulent, unfair, or deceptive; in violation of laws, statutes, or regulations; or constituting unfair competition, along with pre- and post-judgment interest thereon;
- For pre and post-judgment interest on all amounts awarded;
- For an order of restitution and all other forms of equitable monetary relief, as pleaded, including awarding such relief pursuant to Bus. & Prof. Code § 17535; and/or Bus. & Prof. Code § 17203;
- Actual damages under California Civil Code § 1780(a);
- For public injunctive relief as pleaded or as the Court may deem proper;
- That Defendant be enjoined from continuing the wrongful conduct alleged herein and required to comply with all applicable laws;
- Punitive damages including under California Civil Code § 1780(a) and/or Cal. Civ. Code § 3294;
- General and compensatory damages in an amount to be determined at trial;
- That Plaintiffs and each of the other members of the Class recover their costs of suit, including reasonable attorneys' fees and expenses pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5 and California Civil Code § 1780; and
- That Plaintiffs and the members of the Class be granted any other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

280. Plaintiffs, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.

Dated: December 10, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: _/s/ *Abbas Kazerounian*___
Abbas Kazerounian, Esq.
*ATTORNEYS FOR PLAINTIFFS*

**Additional Plaintiff's Counsel**
**KAZEROUNI LAW GROUP, APC**
Ryan L. McBride, Esq. (SBN: 297557)
ryan@kazlg.com
Jonathan Gil, Esq. (SBN: 347431)
jonathan@kazlg.com
2221 Camino Del Rio S., #101
San Diego, California 92108
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

KAZEROUNI LAW GROUP, APC